# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71929-7-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| WALLACE ROBINSON, JR., | ) | PUBLISHED |
| | ) | |
| Appellant. | ) | FILED: August 31, 2015 |
| | ) | |

Cox, J. — Wallace Robinson appeals his judgment and sentence following his conviction of second degree robbery. His Sixth Amendment right to confrontation was not violated by the admission into evidence of a recorded 911 call by a witness to the robbery. And the prosecutor did not commit misconduct by using the word "we" during closing argument to argue to the jury inferences to be drawn from the evidence at trial. We affirm.

The material facts are largely undisputed. During the early morning hours of October 27, 2013, Hector Aguayo stood near the entrance of Pike Place Market in downtown Seattle. He was talking to a friend on his white iPhone. Aguayo called his friend to get a ride to West Seattle, where he hoped to join other friends with whom he had spent the earlier part of that night.

While Aguayo was talking on his phone, Robinson approached and started talking to him. Aguayo avoided speaking with Robinson and remained on his phone with his friend. Robinson became increasingly aggressive and agitated, according to Aguayo's testimony at trial.

Aguayo began moving away from Robinson, while remaining on the phone. Robinson followed. As Aguayo moved through a breezeway off Second Avenue, Robinson hit Aguayo in the face. The two struggled. According to Aguayo's testimony at trial, Robinson had his hand on Aguayo's phone during most of the struggle. Aguayo testified that Robinson struck him a second time in the breezeway. Shortly after this struggle ended, Robinson fled.

Aguayo chased after Robinson, demanding that Robinson return his phone. The two exchanged words during the chase. Aguayo testified at trial that during the chase, Robinson faced him and showed him the iPhone. Aguayo recognized the phone as his by its distinctive case and sticker on the phone's "home button." During these events, Aguayo continued to demand the return of his phone and yell for help.

During this incident, a 911 caller, who identified himself as Leslie Caldwell, witnessed these events and reported them, as they developed, to authorities. Caldwell was a concierge at a condominium complex near the breezeway where Robinson struck Aguayo.

Police responded to the reported robbery and spotted a man fitting Robinson's description just north of Spring Street and Second Avenue. Aguayo

was still chasing Robinson when the police arrived. The officers arrested Robinson.

The State charged Robinson with second degree robbery and second degree attempted robbery. Before trial, Robinson moved to suppress the 911 recording of Caldwell's call. The State was unable to locate Caldwell to testify at trial. Accordingly, the State claimed the 911 call was a present sense impression, not excludable as hearsay. Robinson claimed that admitting the call would violate his Sixth Amendment right to confront Caldwell. The court denied the motion, ruling that the call was not testimonial and was also a present sense impression.[1]

At trial, the court admitted the 911 recording into evidence. Robinson did not testify and did not dispute that he assaulted Aguayo. In closing, his counsel argued to the jury that Robinson did not take Aguayo's white iPhone, but that it was swatted away and fell to the ground during their struggle in the breezeway. Counsel based this argument on alleged inconsistencies in Aguayo's testimony at trial. Accordingly, counsel urged the jury to not convict Robinson of either robbery or attempted robbery.

The jury found Robinson guilty of second degree robbery. The court entered its judgment and sentence on the jury verdict.

Robinson appeals.

---

[1] ER 803(a)(1).

## CONFRONTATION CLAUSE

Robinson argues that the admission of Caldwell's 911 recording violated the Sixth Amendment's confrontation clause. We hold that Caldwell's statements during the call were not testimonial under the circumstances of this case and did not violate Robinson's right to confrontation.

Under the Sixth Amendment, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."[2] We review de novo confrontation clause challenges.[3] In Crawford v. Washington, the United States Supreme Court held that this provision prohibits the "admission of testimonial statements of a witness who d[oes] not appear at trial unless he [is] unavailable to testify, and the defendant had [] a prior opportunity for cross-examination."[4]

In that case, Michael Crawford was prosecuted for stabbing a man who allegedly attempted to rape his wife, Sylvia.[5] She witnessed the stabbing.[6] On the night of the stabbing, police took Sylvia into custody, informed her that she was a potential suspect, and interrogated her about the incident.[7] For purposes

---

[2] U.S. CONST. amend. VI.

[3] State v. Koslowski, 166 Wn.2d 409, 417, 209 P.3d 479 (2009).

[4] 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

[5] Id. at 38.

[6] Id. at 38-39.

[7] Id. at 65.

4

of trial, she was unavailable because of spousal privilege.[8] Thus, the State introduced her recorded statement to police during interrogation to disprove her husband's claim that he acted in self-defense.[9] The jury convicted him, and the state supreme court affirmed.[10]

The United States Supreme Court reversed.[11] While it declined to spell out a comprehensive definition of "testimonial," the Court stated that at minimum it includes "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and [] police interrogations."[12] Because Sylvia Crawford's recorded statement was testimonial and Michael Crawford had no opportunity to cross-examine her, introducing the statement violated his Sixth Amendment right.[13]

The United States Supreme Court considered further what statements are testimonial in the consolidated cases of Davis v. Washington[14] and Hammon v. Indiana.[15] Both of these cases involved domestic violence.

---

[8] Id. at 40.

[9] Id.

[10] Id. at 41.

[11] Id. at 69.

[12] Id. at 68.

[13] Id.

[14] 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

[15] 829 N.E.2d 444 (Ind. 2005).

In <u>Davis</u>, Michelle McCottry made statements to a 911 operator during a domestic disturbance with Adrian Davis, her former boyfriend.[16] She reported, "He's here jumpin' on me again," and "[h]e's usin' his fists."[17] The operator asked for his name, which McCottry provided.[18] McCottry also responded that Davis was "runnin' now."[19] She did not appear at trial, and the trial court admitted the 911 recording of her conversation with the operator.[20]

In <u>Hammon</u>, police responded to a domestic disturbance call at the residence of Amy and Hershel Hammon.[21] They found Amy Hammon on the front porch, appearing "'somewhat frightened.'"[22] She told them "'nothing was the matter.'"[23] After obtaining her permission, police entered the house, encountering Hershel Hammon.[24] They kept the parties separated while interviewing them both.[25]

---

[16] <u>Davis</u>, 547 U.S. at 817.

[17] <u>Id.</u>

[18] <u>Id.</u> at 818.

[19] <u>Id.</u>

[20] <u>Id.</u> at 819.

[21] <u>Id.</u>

[22] <u>Id.</u>

[23] <u>Id.</u> (quoting <u>Hammon</u>, 829 N.E.2d at 446).

[24] <u>Id.</u> (quoting <u>Hammon</u>, 829 N.E.2d at 447.)

[25] <u>Id.</u> at 819-20.

Amy Hammon completed a written battery affidavit, detailing Hershel Hammon's assaults on her and her daughter prior to police arriving on the scene.[26] Because she did not appear at his trial, police who interviewed her testified to her statements and authenticated her battery affidavit.[27] The trial court admitted this evidence, and his conviction followed.[28] The Indiana Supreme Court affirmed.[29]

The United States Supreme Court affirmed the conviction in Davis and reversed that in Hammon.[30] In its analysis, the Court expanded upon the meaning of "testimonial" discussed in Crawford and discussed the meaning of an ongoing emergency.[31]

In doing so, the Court adopted the "primary purpose" test to determine whether a statement is testimonial.[32] Under this test:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to

---

[26] Id. at 820.

[27] Id. at 820-21.

[28] Id.

[29] Id. at 821.

[30] Id. at 834.

[31] Id. at 822.

[32] Id.

establish or prove past events potentially relevant to later criminal prosecution.[33]

Applying this test to the statements in Davis, the Court decided they were nontestimonial.[34] In reaching its conclusion, the Court distinguished them from those in Crawford. One distinguishing factor was that the victim's statements in Davis were "about events as they were actually happening, rather than 'describ[ing] past events.'"[35] Moreover, there was an ongoing emergency, and the statements were necessary to resolve that emergency.[36] Finally, the statements were not formal.[37]

On the other hand, it was quite clear in Hammon that the police interrogation "was part of an investigation into possibly criminal past conduct."[38] There was no emergency at the time of the interrogation.[39] And Amy Hammon's interrogation was sufficiently formal, although done at her house rather than at

---

[33] Id.

[34] Id. at 828.

[35] Id. at 827 (alteration in original) (quoting Lilly v. Virginia, 527 U.S. 116, 137, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999)).

[36] Id.

[37] Id.

[38] Id. at 829.

[39] Id. at 829-30.

the police station.[40] Thus, the statements were not a cry for help to enable authorities to end a threatening situation.[41]

The Supreme Court further developed its jurisprudence on testimonial statements and ongoing emergencies in Michigan v. Bryant.[42] There, the trial court admitted Anthony Covington's statements "made to police officers who discovered him mortally wounded in a gas station parking lot."[43] A jury convicted Richard Bryant of second degree murder of Covington.[44] The primary issue in his appeal was whether admitting Covington's statements into evidence violated his Sixth Amendment right to confrontation.[45] The Supreme Court of Michigan held the admission of Covington's statements violated the confrontation clause.[46]

The United States Supreme Court vacated the judgment and remanded.[47] In its analysis, the Court stated the primary purpose of a statement alleged to be testimonial is determined by "objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the

---

[40] Id. at 830.

[41] Id. at 832.

[42] 562 U.S. 344, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011).

[43] Id. at 348.

[44] Id.

[45] Id.

[46] Id.

[47] Id. at 349.

interrogation occurs."[48] Whether an "ongoing emergency" exists at the time of the statements "is among the most important circumstances informing the 'primary purpose' of an interrogation."[49] This is because "statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation."[50] "'[T]he nature of what was asked and answered'" helps determine whether statements were elicited "'to be able to resolve the present emergency'" or to establish "'what had happened in the past.'"[51]

Because the primary purpose of the statements in Bryant was to meet an ongoing emergency, the Court determined that the statements were nontestimonial.[52]

Recently, the Supreme Court added to this line of case law with Ohio v. Clark.[53] That case involved statements made by Darius Clark's girlfriend's son, L.P.[54]

---

[48] Id. at 370.

[49] Id. at 361.

[50] Id. at 370.

[51] Id. at 367 (alteration in original) (quoting Davis 547 U.S. at 827).

[52] Id. at 377-78.

[53] ___ U.S. ___, 135 S. Ct. 2173 (2015).

[54] Id. at 2177.

After Clark took L.P. to preschool, one of his teachers noticed injuries on him.[55] The teacher asked L.P. what happened, and he stated that he fell.[56] The teacher then took him to the lead teacher, who asked L.P., "'Who did this? What happened to you?'"[57] L.P. responded that it had been "Dee," which was Clark's nickname.[58] After discovering more injuries on L.P., the teachers and their supervisor reported suspected child abuse to authorities.[59]

At trial, the State introduced L.P.'s statements, but he did not testify.[60] Clark argued that the Confrontation Clause prohibited introducing L.P.'s statements.[61] The Supreme Court held that L.P.'s statements "were not made with the primary purpose of creating evidence for Clark's prosecution."[62] Instead, the primary purpose of L.P.'s teachers' conversations with him was to protect him from further abuse.[63] Thus, the statements were not testimonial.[64]

---

[55] Id. at 2178.

[56] Id.

[57] Id. (quoting State v. Clark, 137 Ohio St. 3d 346, 348, 999 N.E.2d 592 (2013)).

[58] Id.

[59] Id.

[60] Id.

[61] Id.

[62] Id. at 2181.

[63] Id.

[64] Id.

Our analysis is further informed by our state supreme court. In State v. Koslowski, the court looked to Crawford, Davis, and Hammon to determine whether there was a violation of the Sixth Amendment right to confrontation.[65] At the time of the Koslowski decision, the United States Supreme Court had not yet decided Bryant or Clark.

Comparing the circumstances in Crawford with those in Davis, our state supreme court adopted a four factor test to determine whether the primary purpose of police interrogation is to enable assistance to meet an ongoing emergency:

> (1) Was the speaker speaking about current events as they were actually occurring, requiring police assistance, or was he or she describing past events? The amount of time that has elapsed (if any) is relevant.
>
> (2) Would a "reasonable listener" conclude that the speaker was facing an ongoing emergency that required help? A plain call for help against a bona fide physical threat is a clear example where a reasonable listener would recognize that the speaker was facing such an emergency.
>
> (3) What was the nature of what was asked and answered? Do the questions and answers show, when viewed objectively, that the elicited statements were necessary to resolve the present emergency or do they show, instead, what had happened in the past? For example, a 911 operator's effort to establish the identity of an assailant's name so that officers might know whether they would be encountering a violent felon would indicate the elicited statements were nontestimonial.
>
> (4) What was the level of formality of the interrogation? The greater the formality, the more likely the statement was testimonial. For example, was the caller frantic and in an environment that was not tranquil or safe?[66]

---

[65] Koslowski, 166 Wn.2d at 417-19.

[66] Id. at 418-19.

Here, there is no dispute that Caldwell was "speaking about current events as they were actually occurring," as the test's first factor requires. It is also undisputed that the unfolding events surrounding the robbery required police assistance. And, as Robinson correctly concedes, these statements were present sense impressions of the speaker, admissible as an exception to hearsay.

The 911 call recording bears out these observations. The exchanges between the 911 operator and Caldwell state:

THE OPERATOR: 911. What are you reporting?

[CALDWELL]: Yes, hi. I'm here at 1521 Second Avenue. I'm the concierge, and I'm witnessing an assault. Some—a black guy just assaulted a guy—I guess he's in costume.

THE OPERATOR: In front?

[CALDWELL]: He's beating him up and stealing his phone right now.

THE OPERATOR: In front? I'm asking the location, sir.

[CALDWELL]: 1521.

. . .

THE OPERATOR: Okay. Radio, this an assault, perhaps a robbery being witnessed by the concierge at 1521 Second Avenue. He says in front he witnessed a black male hitting, beating up on a Hispanic or white male. It looked like he might have been stealing his phone.

THE DISPATCHER: Are they still there?

[CALDWELL]: They have now gone to Second Avenue. You can still hear them screaming. The guy is still asking . . . for his phone.

. . .

13

[CALDWELL]: (Indecipherable) and Pike. They're now on Pike. And now the guy is running after the other guy for it. He's really— he is not going to let him get away with his phone.[67]

Throughout the call, Caldwell continued to describe events as they developed.

We turn to the second Koslowski factor: whether a "reasonable listener" would conclude that the speaker was facing an ongoing emergency that required help. There is little doubt that what Caldwell witnessed and reported to the 911 operator was an ongoing emergency. Caldwell reported Robinson assaulting Aguayo in the breezeway. Aguayo was in some form of costume, and Caldwell reported that Robinson was "beating [Aguayo] up and stealing his phone right now."[68]

That this emergency was ongoing is also clear. Caldwell reported that Aguayo was "literally chasing [Robinson] down the street."[69] He further stated "[Aguayo] was—he was not—going to give up without a fight."[70] Having hit Aguayo at least once in the breezeway, it was unclear whether Robinson would hit him again, as Aguayo followed, yelling for help.

The question is whether this second factor requires that the caller ("speaker") be the victim. We think not.

---

[67] Report of Proceedings (April 10, 2014) at 210-12.

[68] Id. at 211.

[69] Id. at 214.

[70] Id. at 215.

14

A close reading of <u>Koslowski</u> makes clear that the supreme court primarily had in mind challenged statements by victims. Those were the facts in that case.[71] And the court's analysis primarily focused on <u>Davis</u> and <u>Hammon</u>, which were both domestic violence cases.[72] But the court was neither called upon to decide, nor did it rule on, whether statements by other witnesses who report ongoing emergencies to police are either testimonial or nontestimonial.

Robinson argues that Caldwell's statements were testimonial because Caldwell did not personally "face an ongoing emergency or require help." We are not persuaded that this is correct.

First, in <u>Crawford</u>, Sylvia Crawford was a witness to her husband's violent act against another, not a victim of that violence. The United States Supreme Court would have had no reason in that case to examine whether her statements to police were testimonial if the fact that she neither faced an ongoing emergency nor required help were constitutionally determinative.

Second, we can easily envision a scenario where a child calls a 911 operator to report an ongoing emergency of domestic violence that she is witnessing. In such a case, we seriously doubt that our state supreme court would hold that the fact the child was not personally in danger would be constitutionally significant.

For these reasons, we reject Robinson's reading of <u>Koslowski</u>.

---

[71] <u>Koslowski</u>, 166 Wn.2d at 412-13.

[72] <u>Id.</u> at 418-421.

Turning to the third factor, we conclude that the exchanges between Caldwell and the 911 operator, viewed objectively, show the statements were necessary to resolve a present ongoing emergency. Caldwell was reporting an ongoing assault—he stated that "[Robinson]'s beating him up and stealing his phone *right now*."[73] Later he stated "[y]ou can still hear them screaming."[74] And the operator's questions focused on determining the location of the altercation, and obtaining descriptions of the participants—information necessary for police to provide assistance.

Robinson argues that Caldwell reported no danger to public safety. He argues that under Bryant "there must be an ongoing threat to the speaker, the police, or the public." For the reasons we just discussed, the record shows there was an ongoing emergency during the exchanges between Aguayo and Robinson until police arrived and arrested Robinson.

Additionally, the interview in this case was informal. Caldwell was not "responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes."[75] Instead, he was describing events as they happened over the phone to a 911 operator.

For these reasons, we conclude that the statements in the 911 call were not testimonial.

---

[73] Report of Proceedings (April 10, 2014) at 211 (emphasis added).

[74] Id. at 212.

[75] See Davis, 547 U.S. at 827.

16

## PROSECUTORIAL MISCONDUCT

Robinson next argues that the prosecutor committed misconduct during closing argument. We hold that there was no misconduct under the circumstances of this case.

To prevail on a claim of prosecutorial misconduct, the defendant must establish that the prosecutor's conduct was both improper and prejudicial.[76] A prosecutor commits misconduct by vouching for a witness's credibility.[77] "Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony."[78]

"In closing argument, a prosecutor is afforded wide latitude to draw and express reasonable inferences from the evidence."[79]

This court reviews a trial court's decision on alleged prosecutorial misconduct for abuse of discretion.[80] We review alleged prosecutorial misconduct in "the context of the total argument, the issues in the case, the evidence [addressed in the argument], and the instructions given to the jury."[81]

Here, the prosecutor did not commit misconduct.

---

[76] State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).

[77] State v. Coleman, 155 Wn. App. 951, 957, 231 P.3d 212 (2010).

[78] Id.

[79] State v. Reed, 168 Wn. App. 553, 577, 278 P.3d 203 (2012).

[80] State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014).

[81] Emery, 174 Wn.2d at 764 n.14.

17

Robinson objected to two of the prosecutor's statements. First, the prosecutor stated "But what we do know from Mr. Aguayo's testimony—and Mr. Aguayo has no reason to lie about this. He has no reason."[82]

At that point, Robinson objected, and the court overruled the objection. The prosecutor then continued:

> Mr. Aguayo has no motive to fabricate what he told you he saw Mr. Robinson do at the Starbucks, which was remove his phone. And it wasn't Mr. Robinson's phone as [Robinson's counsel] would have you speculate. It was his phone. He said I recognized it, because it had that special detail on the button. And then placed that cover on the—on the table. Mr. Aguayo had no motive to fabricate that.[83]

Robinson then objected again, and his objection was overruled.

The prosecutor's statements were not impermissible vouching. As stated earlier, vouching can occur in two ways: "[T]he prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony."[84] Here, neither occurred.

Nothing in the prosecutor's comments suggest that he had a special source of knowledge. Instead, his statements were argument that the evidence presented at trial demonstrated Aguayo had no motive to lie. The prosecutor stated, "Mr. Aguayo then continued to pursue Mr. Robinson. He had no motive

---

[82] Report of Proceedings (April 14, 2014) at 289.

[83] Id. at 290.

[84] Coleman, 155 Wn. App. at 957.

to pursue Mr. Robinson if the cell phone wasn't the focus of Mr. Robinson's intent."[85] Thus, the prosecutor was simply drawing inferences from the evidence at trial, not implying knowledge of facts outside the evidence.

The prosecutor also did not "place the prestige of the government behind the witness."[86] Nothing in the prosecutor's statements personally endorsed Aguayo as a witness.

Thus, the trial court properly overruled Robinson's objections to the prosecutor's statements.

Robinson argues that the prosecutor's use of "we know" was vouching for the witness and an attempt to align the jury against Robinson. Robinson cites cases from other jurisdictions to argue that use of "we know" is improper. But the cases Robinson cites do not support the proposition that use of "we know" is always misconduct, or that it was misconduct in this case.

In United States v. Younger, the court stated that prosecutors should avoid using the phrase "we know" because it "readily blurs the line between improper vouching and legitimate summary."[87] But the court held that the prosecutors' statements in that case were not improper because "the prosecutors used the phrase 'we know' to marshal evidence actually admitted at trial and reasonable inferences from that evidence, not to vouch for witness veracity or

---

[85] Report of Proceedings (April 14, 2014) at 290.

[86] See Coleman, 155 Wn. App. at 957.

[87] 398 F.3d 1179, 1191 (9th Cir. 2005).

suggest that evidence not produced would support a witness's statements."[88] In this case, the prosecutor also used "we know" to draw reasonable inferences from the evidence, not for any improper purpose.

Similarly, in United States v. Bentley, the court stated that it is misconduct for the prosecutor to use "we know" "when it suggests that the government has special knowledge of evidence not presented to the jury, carries an implied guarantee of truthfulness, or expresses a personal opinion about credibility."[89] But in this case, "we know" did not imply special knowledge or express a personal opinion.

In State v. Mayhorn, the court stated that "a prosecutor is not a member of the jury, so to use 'we' and 'us' is inappropriate and may be an effort to appeal to the jury's passions."[90] But in that case, the court was "concern[ed] that there may have been instances in th[e] trial in which the state attempted to highlight cultural differences between the predominantly white jury and the defendant."[91] In this case, there is no allegation that the State used "we" to attempt to align the jury against Robinson on racial or socioeconomic grounds.

Here, because the prosecutor used "we know" to marshal the evidence, the prosecutor did not commit misconduct.

---

[88] Id.

[89] 561 F.3d 803, 812 (8th Cir. 2009).

[90] 720 N.W.2d 776, 790 (Minn. 2006).

[91] Id. at 789.

## STATEMENT OF ADDITIONAL GROUNDS

Robinson raises several issues in his Statement of Additional Grounds for Review. None warrants reversal.

Robinson challenges the admission of the 911 tape under article I, section 22 of the state constitution. But our supreme court has recently reaffirmed that article I, section 22's confrontation clause and the Sixth Amendment's confrontation clause have the same standards.[92] The supreme court noted, "Neither the constitutional text, the historical treatment of the confrontation right, nor the current implications of adopting a broader confrontation right support an independent reading of article I, section 22."[93]

Thus, for the reasons we explained earlier in this opinion, the admission of the 911 tape did not violate Robinson's state constitutional rights.

Robinson also points out alleged inconsistencies in Aguayo's testimony. For example, Robinson notes that Aguayo stated that he had lived in Portland for 23 years, but later stated that he was 22 years old. Additionally, Aguayo stated that he had not consumed any alcohol that night, but an officer noted the smell of alcohol on Aguayo's breath. But the jury had the opportunity to weigh Aguayo's testimony and chose to believe him. This court does not review on appeal credibility determinations.

---

[92] State v. Lui, 179 Wn.2d 457, 469-70, 315 P.3d 493, cert. denied, 134 S. Ct. 2842, 189 L. Ed. 2d 810 (2014).

[93] Id.

Robinson also argues that the prosecutor lied when he stated that Aguayo had no motive to lie. Robinson argues that under the terms of Aguayo's insurance, Aguayo may have received a new phone if he were the victim of a crime, but not if he had simply lost his phone. But the record is silent on whether Aguayo had insurance and the terms of any such insurance policy. It was not misconduct for the prosecutor to point out that nothing in the record suggested that Aguayo had a motive to lie.

Finally, Robinson argues that his counsel's performance was constitutionally deficient for failing to object to the 911 recording under ER 804. Specifically, Robinson contends that the State failed to prove that Caldwell was unavailable. But in this case, the court did not admit the 911 call under ER 804. Instead, the court admitted the call as a present sense impression under ER 803(a)(1). Under ER 803, present sense impressions are not excluded as hearsay "even though the declarant is available as a witness."[94] Thus, the State was not required to prove that Caldwell was unavailable.

We affirm the judgment and sentence.

Cox, J.

WE CONCUR:

Leach, J.

Schindler, J.

---

[94] ER 803(a).

22